**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

9:23-cv-80791 | CIVIL | MIDDLEBROOKS/MATTHEWMAN

KIRILL VESSELOV, MIKHAIL
VESSELOV, and HAVEN HEALTH
MANAGEMENT LLC,

      Plaintiffs,

v.

LAIRD HARRISON and MEDSCAPE LLC,

      Defendants.

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**
**WITH INCORPORATED MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ...................................................................................................... 1

II.  LEGAL STANDARD ............................................................................................... 2

III.  FACTS ...................................................................................................................... 2

    A.  The *Gilead* Case .............................................................................................. 2

    B.  The Medscape Article ...................................................................................... 4

    C.  This Lawsuit ..................................................................................................... 7

IV.  ARGUMENT ............................................................................................................ 8

    A.  Plaintiffs Failed to Provide Statutory Pre-Suit Notice to Mr. Harrison. ................. 8

    B.  Plaintiffs' Complaint Fails to State a Claim for Defamation Because the
        Statements at Issue in the Article are True and the Article is Protected by
        the Fair/Neutral Reporting Privilege. .......................................................... 9

        1.  Plaintiffs Failed to Sufficiently Plead that Any Specific Statements
            in the Article are False. ...................................................................... 10

            a.  Statement #1 is True. ............................................................. 10

            b.  Statement #2 is True. ............................................................. 11

            c.  Statement #3 is True. ............................................................. 12

            d.  Statement #4 is True. ............................................................. 12

            e.  Statements #5, 6, and 7 are True. ........................................... 13

        2.  The Article is Protected by the Fair/Neutral Reporting Privilege. ............. 14

    C.  Defendants are Entitled to Attorney's Fees and Costs Pursuant to Florida's
        Anti-SLAPP Statute. ................................................................................... 16

V.  CONCLUSION ....................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**Cases**

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ...................................................................................2

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .....................................................................................................2

*Baker v. Sepich*,
   2021 WL 5768069 (S.D. Fla. Oct. 28, 2021) ...............................................................3

*Barbuto v. Miami Herald Media Co.*,
   2021 WL 4244870 (S.D. Fla. Sept. 17, 2021) ..............................................................8

*Barbuto v. Miami Herald Media Co.*,
   2022 WL 123906 (S.D. Fla. Jan. 13, 2022) ...........................................................14, 16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .....................................................................................................2

*Bongino v. Daily Beast Co.*,
   477 F. Supp. 3d 1310 (S.D. Fla. 2020)....................................................................16–17

*Borislow v. Canaccord Genuity Grp. Inc.*,
   2014 WL 12580259 (S.D. Fla. Jun. 27, 2014) .............................................................2

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
   116 F.3d 1364 (11th Cir. 1997) ...................................................................................1

*Corsi v. Newsmax Media, Inc.*,
   519 F. Supp. 3d 1110 (S.D. Fla. 2021).............................................................9–10, 17

*Cunningham v. Mimms*,
   2023 U.S. Dist. LEXIS 74352 (S.D. Fla. Apr. 28, 2023)...........................................2, 9

*Damian v. Meftah*,
   2021 WL 8775762 (S.D. Fla. Dec. 28, 2021) ............................................................8–9

*Ellison v. Postmaster Gen.*,
   2022 WL 4726121 (11th Cir. Oct. 3, 2022)..................................................................1

*Folta v. N.Y. Times Co.*,
   2019 WL 1486776 (N.D. Fla. Feb. 27, 2019)..............................................................16

*Glover v. Liggett Grp., Inc.*,
   459 F.3d 1304 (11th Cir. 2006) ...................................................................................2

*Gubarev v. Buzzfeed, Inc.*,
   2017 WL 6547898 (S.D. Fla. Dec. 21, 2017)..............................................................15

*Happy Tax Franchising, LLC v. Hill*,
   2020 WL 6946086 (S.D. Fla. Sept. 2, 2020)................................................................9

*Jackson v. Bellsouth Telecomms., Inc.*,
   2002 WL 34382751 (S.D. Fla. June 4, 2002) ............................................................. 1

*Jeter v. McKeithen*,
   2014 WL 4996247 (N.D. Fla. Oct. 7, 2014) ......................................................... 10, 16

*Jews for Jesus, Inc. v. Rapp.*,
   997 So.2d 1098 (Fla. 2008) ........................................................................................ 9

*Klayman v. Politico LLC*,
   2022 WL 1134304 (15th Fla. Cir. Ct. Mar. 22, 2022) ............................................. 16

*Mancini v. Personalized Air Conditioning & Heating, Inc.*,
   702 So.2d 1376 (4th Fla. Dist. Ct. App. 1997) .......................................................... 8

*Marder v. TEGNA Inc.*,
   2020 WL 3496447 (S.D. Fla. Jun. 29, 2020) ............................................. 2, 10, 13–14

*Mazur v. Baraya*,
   275 So.3d 812 (2d Fla. Dist. Ct. App. 2019) ...................................................... 14–15

*Parekh v. CBS Corp.*,
   820 Fed. App'x 827 (11th Cir. 2020) ................................................................... 9, 17

*Perk v. Reader's Digest Ass'n*,
   931 F.2d 408 (6th Cir. 1991) ..................................................................................... 16

*Rasmussen v. Collier Cnty. Publ'g Co.*,
   946 So.2d 567 (2d Fla. Dist. Ct. App. 2006) ............................................................ 16

*Readon v. WPLG, LLC*,
   317 So.3d 1229 (3d Fla. Dist. Ct. App. 2021) .......................................................... 10

*Rendón v. Bloomberg, L.P.*,
   403 F. Supp. 3d 1269 (S.D. Fla. 2019) ............................................................. 8, 9, 14

*Tobinick v. Novella*,
   2015 WL 1191267 (S.D. Fla. Mar. 16, 2015) ........................................................... 15

*Turner v. Wells*,
   879 F.3d 1254 (11th Cir. 2018) ................................................... 9, 10, 13–14, 16

*U.S. ex rel. Osheroff v. Humana, Inc.*,
   2012 WL 4479072 (S.D. Fla. Sept. 28, 2012) .......................................................... 14

*United Am. Corp. v. Bitmain, Inc.*,
   530 F. Supp. 3d 1241 (S.D. Fla. 2021) .................................................................. 8–9

*United States v. Jones*,
   29 F.3d 1549 (11th Cir. 1994) ..................................................................................... 2

*Vibe Ener v. Duckenfield*,
   2020 WL 6373419 (S.D. Fla. Sept. 29, 2020) .......................................................... 17

**Statutes**

Fla. Stat. § 768.295 ................................................................................... 1, 2, 16, 17

Fla. Stat. § 770.01 ................................................................................................... 1, 8, 9, 15

**Rules**

Fed. R. Civ. P. 8(a)(2) ..................................................................................................... 2

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 1, 2

Fed. R. Evid. 201 ............................................................................................................ 3

L.R. 7.3 ......................................................................................................................... 17

Defendants Laird Harrison ("Harrison") and Medscape LLC ("Medscape") (collectively, "Defendants") respectfully request that the Court dismiss Plaintiffs' Amended Complaint (*see* ECF No. 15, the "Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6), and award attorney fees and costs to the Defendants pursuant to Florida Statutes section 768.295 (Florida's anti-SLAPP statute). The Court should dismiss the Amended Complaint as to Mr. Harrison because he was not provided the requisite pre-suit notice. The Court should also dismiss the Amended Complaint as to both Mr. Harrison and Medscape, because the Article, and the statements at issue therein, (1) are accurate, (2) do not provide a false impression, and (3) are subject to the fair/neutral report privilege. In support of this motion, Defendants state as follows:

## I.   **INTRODUCTION**

Medscape operates the medical information and news website www.medscape.com and, on May 16, 2022, published an article written by journalist Laird Harrison (the "Article").[1] The Article focused on a lawsuit (the "*Gilead* Case") brought by Gilead Sciences against approximately 58 named defendants, including the Plaintiffs, based on an alleged scheme to steal money from Gilead's Medication Assistance Program ("MAP"). The Article reported on the allegations in the *Gilead* Case and on several case developments.

Plaintiffs' Amended Complaint for defamation is based on seven statements contained in the Article. As a threshold matter, Plaintiffs do not allege that they provided pre-suit notice to Mr. Harrison, as required by Florida Statutes section 770.01, and therefore the claims against Mr. Harrison must be dismissed. Additionally, when the Article is read in full and compared to the documents publicly filed in the *Gilead* Case, the Article, along with each of the seven statements at issue, is accurate, does not provide a false impression, and is protected by the fair/neutral reporting privilege. Thus, Plaintiffs' claims against both Defendants are meritless and must be dismissed.

---

[1] A true and accurate copy of the Article *as originally published* is attached hereto and incorporated as **Exhibit A**. The version attached as Exhibit A to the Plaintiffs' Amended Complaint (*see* ECF No. 15-1) is not a true and accurate copy of the Article as originally published but rather appears to be a *revised version* that was published after the Plaintiffs' service of pre-suit notice upon Medscape. The Court may consider the Article as a document central to Plaintiffs' claim. *Jackson v. Bellsouth Telecomms., Inc.*, 2002 WL 34382751, at *3 (S.D. Fla. June 4, 2002) (Middlebrooks, J.) ("where the plaintiff refers to certain documents in the complaint and these documents are central to the plaintiff's claim, . . . the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal.") (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); *see also Ellison v. Postmaster Gen.*, 2022 WL 4726121, at *6 (11th Cir. Oct. 3, 2022).

Because Plaintiffs' claims are meritless, Defendants are also entitled to attorneys' fees and costs in accordance with Florida's anti-SLAPP statute. *See* Fla. Stat. § 768.295.

## II.   LEGAL STANDARD

Courts should dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To "state a claim," a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). To survive a motion to dismiss for failure to state a claim, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Rather, a party must plead "factual allegations" sufficient to "raise [the plaintiff's] right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Cunningham v. Mimms*, 2023 U.S. Dist. LEXIS 74352[2], at *4 (S.D. Fla. Apr. 28, 2023) (Middlebrooks, J.) (quoting *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006)).

"Courts in this jurisdiction and elsewhere routinely dismiss defamation claims on motions to dismiss." *Borislow v. Canaccord Genuity Grp. Inc.*, 2014 WL 12580259, at *1 (S.D. Fla. Jun. 27, 2014). Early dismissal is "'especially appropriate' because of the chilling effect these cases have on freedom of speech." *Marder v. TEGNA Inc.*, 2020 WL 3496447, at *3 (S.D. Fla. Jun. 29, 2020).

## III.   FACTS

### A.   The *Gilead* Case.

On November 30, 2020, Gilead Sciences, Inc. filed suit in the U.S. District Court for the Southern District of Florida, Case No. 1:20-cv-24523-AMC (the "*Gilead* Case"), against 58 parties, including clinics, pharmacies, and individuals. *Gilead* Case, ECF No. 1.[3] The defendants in the

---

[2] Westlaw citation not available.

[3] A court "may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994);

*Gilead* Case included the three Plaintiffs, Mikhail and Kirill Vesselov and their clinic, Haven Health Management LLC. Am. Compl. ¶ 21. In the two months preceding the Article, multiple developments occurred in the *Gilead* Case, including the following:

1.  On March 29, 2022, the Court held an *Ex Parte* Motion Hearing on multiple motions, including Gilead's Motion for Leave to Amend the Complaint, and Motion for Temporary Restraining Order and Preliminary Injunction. *See Gilead* Dkt. 774.

2.  On April 18, 2022, the Court entered an Order (*Gilead* Dkt. 779, "Gilead TRO Order"), granting Gilead's Motion for Injunctive Relief.[4] The order noted that Mikhail and Kirill Vesselov were identified as the "kingpins" (5 n.3).

3.  On April 18, 2022, Gilead filed its First Amended Complaint (*Gilead* Dkt. 782, *"Gilead Amended Complaint"*) against various defendants, including the Plaintiffs.[5] Among many other things, the Gilead Amended Complaint:

    -   described Mikhail and Kirill Vesselov as "kingpins" (¶ 21);

    -   alleged that "the fraud perpetrated by [d]efendants significantly undermines the integrity of the MAP and wrongly takes resources from a charitable program operated by Gilead" and that one of the defendant networks purchased medications back from "patients" so "they c[ould] be resold at a higher price on the black market." (¶¶ 7, 356, and generally); and

    -   discussed the process by which defendants allegedly forged signatures on enrollment paperwork, processed fraudulent MAP enrollments by providing blood testing services, submitted fraudulent redemptions, and wrongfully obtained fees and reimbursement for PrEP medication to

---

*see also Baker v. Sepich*, 2021 WL 5768069, at *3 (S.D. Fla. Oct. 28, 2021) (Middlebrooks, J.) ("As a general matter, courts routinely take judicial notice of public records, including court filings. Matters judicially noticed can be appropriately considered on a motion to dismiss. Doing so will not automatically convert the motion to dismiss into a motion for summary judgment.") (citations omitted). Pursuant to Fed. R. Evid. 201, Defendants request that this Court take judicial notice of the docket sheet from the *Gilead* Case (a true and accurate copy of which, as of the date of the filing of this Motion, is attached hereto and incorporated as **Exhibit B**), along with certain documents filed in the *Gilead* Case, including Exhibits C, D, E, F, and G referenced below, to show that the statements in the Article, which are asserted as false by the Plaintiffs, are true because the Article simply recites the statements and allegations made in the *Gilead* Case.

[4] A true and accurate copy of the Gilead TRO Order is attached hereto and incorporated as **Exhibit C**.

[5] A true and accurate copy of the Gilead Amended Complaint is attached hereto and incorporated as **Exhibit D**.

recruits that had been fraudulently enrolled (¶¶ 223, 259, 378–79, and generally).

4.   On April 20, 2022, Gilead filed a PowerPoint Presentation (*Gilead* Dkt. 793-2, "Gilead PowerPoint") that it had presented to the Court during the March 29, 2022 *Ex Parte* Motion Hearing.[6] The presentation contained several slides describing the Vesselovs as "Kingpins" (14–15) and outlining various properties, cryptocurrency, jewelry, cars, private jets, and other expenditures allegedly purchased by the Vesselovs using "tainted accounts" (51, 62–66).

5.   On April 28, 2022, the Court entered an Order of Dismissal and Permanent Injunction (*Gilead* Dkt. 836, "Gilead Dismissal Order"), which noted a confidential settlement agreement between Gilead and various defendants, including the Plaintiffs.[7]

These and other documents formed the basis for the Medscape Article. One of the other documents was a declaration submitted by Donna Quan on November 3, 2020 (*Gilead* Dkt. 11, "Gilead Quan Declaration") in support of Gilead's motion for a temporary restraining order and preliminary injunction.[8] The Gilead Quan Declaration noted the "substantial evidence" that the defendants repurchased bottles of already dispensed PrEP for $10 a bottle and therefore amassed further profits by repackaging it for sale on the black market (¶¶ 43–46).

**B.   The Medscape Article**

Medscape operates the website Medscape.com, which provides medical information, including news articles, to physicians and other registered users.[9] On May 16, 2022, Medscape published an article written by Laird Harrison that reported the allegations, findings of the judge, and publicly filed documents in the *Gilead* Case. Am. Compl. ¶¶ 1–3. The Article reported that "some of the key defendants" had settled with Gilead, acknowledged that the allegations could be

---

[6] A true and accurate copy of the Gilead PowerPoint is attached hereto and incorporated as **Exhibit E**.

[7] A true and accurate copy of the Gilead Dismissal Order is attached hereto and incorporated as **Exhibit F**.

[8] A true and accurate copy of the Gilead Quan Declaration is attached hereto and incorporated as **Exhibit G**.

[9] According to its website, "Medscape is the leading online global destination for physicians and healthcare professionals worldwide, offering the *latest medical news* and expert perspectives; essential point-of-care drug and disease information; and relevant professional education and CME." (emphasis added). *See* https://www.medscape.com/public/about (last visited July 27, 2023).

4

false, and sought and reported on comments from both sides. *See* Ex. A. The Article, as originally published, is reproduced in full below and in the attached Ex. A. The minimal changes in the revised version are noted in footnotes.

### Gilead Settles With Defendants in HIV PrEP Fraud Lawsuit

HIV drugs sold on the black market. Clinics profiting from a charity program. Shady pharmacy owners purchasing mansions and jets.

Such are the accusations Gilead lodged against 58 defendants[10] in a lawsuit alleging they profited illegally from AIDS prevention drugs that it supplies free to people who can't afford them.

"Together, the Kingpin Defendants defrauded Gilead's Charitable program of *more than $68 million* in less than 2 years through a fraudulent mass enrollment scheme," wrote Gilead attorneys in a slide presentation submitted to the US District Court for the Southern District of Florida.

Gilead settled with some of the key defendants in April for an undisclosed amount. But the attorney for one group insists that her clients have been falsely accused and settled only because the court did not allow them to present their case before freezing their assets.

The accusations stem from Gilead's Medication Assistance Program (MAP) that gives away the pre-exposure prophylaxis (PrEP) drugs emtricitabine/tenofovir disoproxil fumarate (Truvada) and emtricitabine/tenofovir alafenamide (Descovy).

PrEP drugs reduce the risk of infection from HIV, and the US Preventive Services Task Force has recommended them for anyone at high risk for HIV, such as men who have sex with men and people who inject drugs. They must be taken daily, and a month's supply purchased out-of-pocket can cost as much as $2,000.

While Medicare, Medicaid, and most private health plans cover the cost, some people have no medical coverage. By enrolling in Gilead's MAP program, they can obtain the drugs for free from pharmacies, which are then reimbursed by Gilead.

In the scheme alleged by Gilead, the defendants sent vans to neighborhoods in Miami where they could find indigent people, many of them homeless, and offer them cash or cash cards for modest amounts if they signed up for MAP.

The defendants allegedly provided false paperwork saying that these patients had met the requirements for the program—such as a negative test for HIV—ordered PrEP drugs for them, and then requested and received reimbursement from Gilead.

According to Gilead, the defendants profited because they worked with clinics enrolled in the US government's 340B drug pricing program, which requires drugmakers to provide drugs at a discount off the wholesale price.

---

[10] The revised article includes the underlined words: "Such are the accusations Gilead lodged against some of the 58 defendants . . . ." *See* ECF No. 15-1.

Under its MAP program, Gilead reimbursed providers at its wholesale price of $1,800 for a 1-month supply of PrEP. "Thus, each time a Defendant or its contract pharmacy dispenses TRUVADA or DESCOVY to a MAP enrollee, the Defendant's profit is more than $1,000 per bottle," Donna Quan, Gilead's senior director of data forensics said in a court declaration.

Gilead has since instituted changes that "ensure that we reimburse a pharmacy dispensing free product in the amount it paid for each bottle, plus a fair market value dispensing and administrative fee," a company spokesperson said in an email to *Medscape Medical News.*

But sometimes the defendants' practices were more blatantly illegal, Quan alleged; they repurchased unused PrEP drugs from patients for $10, then resold them on the black market.

With their ill-gotten gains, Gilead alleged, the defendants purchased real estate, cryptocurrency, jewelry, sports cars, and private jets and gambled.

**An attorney for two of the alleged kingpins in this scheme, Kirill and Mikhail Vesselov, declined to comment.**[11]

But Robyn Lynn Sztyndor, who represents Michael Bogdan, Twiggi Batista, and a pharmacy and laboratory associated with them, denied Gilead's accusations.

"I personally sat through over a dozen full-day depositions of Gilead representatives, and various individuals in the lawsuit," she told *Medscape Medical News.* "And there was zero evidence of any wrongdoing against my clients."

Gilead is trying to avoid giving its drugs away to people who can't afford the retail price, Sztyndor said. She speculated that Gilead looks for clinics and pharmacies with a high volume of MAP business and tries to shut them out of the program with aggressive litigation.

"They are wildly talented at making up a lot of allegations that just have no factual support," she said.

Instead of proving its case in court, Sztyndor said, Gilead filed an ex parte motion to freeze the defendants' assets. An ex parte hearing excludes one party in a legal proceeding. Gilead's attorneys argued that was necessary in this case because the defendants might have hidden their assets before the lawsuit could be settled.

Sztyndor said the motion, which was granted, essentially deprived her clients of the right to defend themselves.

Outside the ex parte hearings, both sides submitted evidence. Gilead produced text messages from recruiters gloating about the patients they were enrolling and testimony from physicians and patients saying their names had been forged. Sztyndor produced contradictory testimony.

---

[11] The revised article adds quotation marks around "kingpins" and omits the names "Kirill and Mikhail Vesselov." *See id.*

Whistleblowers came forward, but, according to Sztyndor, they later recanted their accusations or disappeared.

And in a deposition, Quan admitted she didn't have specific evidence to inculpate Sztyndor's clients.

Sztyndor's clients, deprived of access to their funds, began to run out of money and were forced to settle, she said. Far from profiting from his involvement with HIV prevention, she said, Bogdan lost more than $1.4 million. "He funded this program and lost money, because he outlaid money to help this HIV program because he believed in this program for the community," she said.

Whether Gilead's specific allegations are true, the system for providing PrEP drugs to people without insurance is vulnerable to fraud, said Barbara Kubilus, assistant director of the Behavioral Science Research Corporation, which provides staff to the Miami-Dade HIV/AIDS Partnership.

If a pharmacy can figure out how to get reimbursed for PrEP without actually dispensing it, "they could make a bundle."

Likewise, some patients sell their medications, she told *Medscape Medical News*. "That's very common." There is a particular market for the drugs in Cuba and the Dominican Republic where PrEP drugs are hard to obtain, she said.

But there can be severe consequences for patients if they stop taking the medication. "PrEP is one of, if not the single most important HIV prevention tool in our toolbox," she said. "I would reconsider our system."

**C.    This Lawsuit.**

On March 10, 2023, Plaintiffs filed this lawsuit in the Fifteenth Judicial Circuit Court for Palm Beach County, Florida, Case No. 2023-CA-002219. Defendants timely removed the case to this Court (ECF No. 1) and on June 8, 2023 filed their motion to dismiss the initial Complaint (ECF No. 11). On June 29, 2023, Plaintiffs filed their Amended Complaint. Both the original and amended pleadings challenge the Article as defamatory, based on seven specific statements. *See* Am. Compl. ¶¶ 3–4, 28–34. Plaintiffs assert six counts: Count I – Defamation *Per Se* (Negligence), Count II – Defamation *Per Se* (Knowing or Reckless Disregard), Count III – Defamation *Per Quod* (Negligence), Count IV – Defamation *Per Quod* (Knowing or Reckless Disregard), Count V – Conspiracy to Defame, and Count VI – Injunctive Relief. *See* Am. Compl. According to Plaintiffs, they sent two pre-suit notices to Medscape ("Medscape Notices"). *Id.* ¶¶ 57–60. While they allege "upon information and belief" that Medscape provided the Medscape Notices to Harrison, they do not allege *they* sent any pre-suit notice to Mr. Harrison directly. *Id.*

For the reasons below, Defendants seek dismissal of all counts with prejudice.

## IV.    ARGUMENT

### A.    Plaintiffs Failed to Provide Statutory Pre-Suit Notice to Mr. Harrison.

Plaintiffs fail to allege that *they* delivered pre-suit notice upon Mr. Harrison, despite alleging delivery of two pre-suit notice letters to Medscape. *See id.* Instead, Plaintiffs allege that "[u]pon information and belief, *Medscape* provided a copy of the Notice Letter and the Second Notice Letter to Harrison at some point of time in 2022." *Id.* ¶ 60 (emphasis added). Plaintiffs' allegations are insufficient.

Florida Statutes section 770.01 provides as follows:

> Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, *the plaintiff shall*, at least 5 days before instituting such action, *serve notice in writing on the defendant*, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

(emphases added).

The statute does not distinguish between a publisher and individual reporters (or writers), as it refers generally to "the defendant." *See Barbuto v. Miami Herald Media Co.*, 2021 WL 4244870, at *2–3 (S.D. Fla. Sept. 17, 2021) (dismissing defamation claims against the individual reporter because he was entitled to his own pre-suit notice) (citing *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So.2d 1376, 1377 (4th Fla. Dist. Ct. App. 1997)); *see also Rendón v. Bloomberg, L.P.*, 403 F. Supp. 3d 1269, 1275–76 (S.D. Fla. 2019) (dismissing defamation claims against the individual employees/reporters because a retraction letter addressed to the publications did not put the reporters on notice). As such, the statute has been interpreted as entitling individual reporters to pre-suit notice. *Barbuto*, 2021 WL 4244870, at *2–3; *Rendón*, 403 F. Supp. 3d at 1275–76.

Mr. Harrison is entitled to his own pre-suit notice, and the notice allegedly received by Medscape cannot be imputed to Mr. Harrison. Plaintiffs' *belief* that Medscape *may* have provided a copy of the two pre-suit notice letters to Mr. Harrison, *see* Am. Compl. ¶ 60, is insufficient because Plaintiffs did not directly serve notice on Mr. Harrison. Because Plaintiffs have failed to allege that Mr. Harrison received pre-suit notice in accordance with Florida Statutes section 770.01, Plaintiffs' claims as to Mr. Harrison must be dismissed.[12]

---

[12] Furthermore, "conclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard." *Damian v. Meftah*, 2021 WL 8775762, at *4 (S.D. Fla. Dec. 28, 2021) (cleaned up) (quoting *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp.

**B.      Plaintiffs' Complaint Fails to State a Claim for Defamation Because the Statements at Issue in the Article are True and the Article is Protected by the Fair/Neutral Reporting Privilege.**

The Court should dismiss Plaintiffs' defamation claims because the statements at issue in the Article are true and the Article is protected by the fair/neutral reporting privilege.

> Under Florida law, a plaintiff alleging defamation must show: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory.

*Cunningham*, 2023 U.S. Dist. LEXIS 74352, at *9 (citing *Jews for Jesus, Inc. v. Rapp.*, 997 So.2d 1098, 1106 (Fla. 2008)).

> A statement is defamatory if it "tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, . . . exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." "To determine if a statement is defamatory, it must be considered in the context of the publication."

*Parekh v. CBS Corp.*, 820 Fed. App'x 827, 833 (11th Cir. 2020) (citation omitted) (alteration in original).

However, "true statements, statements that are not readily capable of being proven false . . . are protected from defamation actions." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). And even if statements are false and defamatory, they may be protected by the fair/neutral reporting privilege. *See Rendón*, 403 F. Supp. 3d at 1276 (finding that the plaintiff's complaint failed as a matter of law because the article was protected by Florida's neutral reporting privilege).

Here, Plaintiffs have failed to plead facts sufficient to support their defamation claims, specifically that the statements at issue are false.[13] Because these statements are true and are also

---

3d 1241, 1275 n.21 (S.D. Fla. 2021); *see also Happy Tax Franchising, LLC v. Hill*, 2020 WL 6946086, at *5 (S.D. Fla. Sept. 2, 2020) ("While pleading 'on information and belief' is permitted, 'a plaintiff is still required to allege with particularity the factual basis upon which the information and belief was founded.'"). Thus, even if Florida Statutes section 770.01 allowed for constructive notice, Plaintiffs' allegations do not contain any factual support sufficient to meet the *Twombly* standard.

[13] Additionally, Plaintiffs' claim for conspiracy to defame (Count V) must be dismissed because Plaintiffs fail to allege facts sufficient to support any conversation, meeting, or agreement between the Defendants, or any allegation that the Defendants engaged in some overt act in furtherance of the conspiracy. *See Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1120 n.6 (S.D. Fla. 2021)

subject to the fair/neutral reporting privilege, the Court should dismiss each of Plaintiffs' six counts.

### 1. Plaintiffs Failed to Sufficiently Plead that Any Specific Statements in the Article are False.

The Court should dismiss the defamation claims because the statements at issue are true. As stated above, "[t]rue statements, statements that are not readily capable of being proven false . . . are protected from defamation actions." *Turner*, 879 F.3d at 1262. Additionally, "under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true. A statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Marder*, 2020 WL 3496447, at *5 (cleaned up) (dismissing case even though the defendant media company had stated that the government had filed a criminal complaint, when at that time it had not, because the statement was substantially true as Marder had already committed the crimes he later was charged and convicted of, and the truth would not have produced a different effect on the reader); *see also Jeter v. McKeithen*, 2014 WL 4996247, at *2 (N.D. Fla. Oct. 7, 2014) ("The law does not require perfect accuracy, only that the publication be substantially true."); *Readon v. WPLG, LLC*, 317 So.3d 1229, 1234–35 (3d Fla. Dist. Ct. App. 2021) ("As long as a report is substantially correct, 'it is not necessary that it be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting.'") (cleaned up).

Here, when the Court compares the statements at issue to the truth as alleged in the *Gilead* Case's pleadings, the *Gilead* court's orders, and the motions and documents filed on the *Gilead* Case's public docket—upon which the Article relies—the Court can reach only one conclusion: that the statements in the Article are "[t]rue statements, statements that are not readily capable of being proven false" and are thus protected. *Turner*, 879 F.3d at 1262.

a. Statement #1 is True.[14]

Plaintiffs allege that the following statement in the Article is a false representation:

---

(noting that Corsi failed to plead a facially plausible conspiracy because he alleged "no facts about any conversation(s), meeting(s), or agreement(s)" between the defendants, or any allegation that the defendants engaged in some overt act in furtherance of the conspiracy).

[14] For the Court's ease of reference, Defendants have created a chart which compares the Complaint's allegations to the Article's text and the filings in the *Gilead* Case. A true and accurate copy of this chart is attached hereto and incorporated as **Exhibit H**.

> "HIV drugs were sold on the black market. Clinics profited from a charity program. The owners purchased mansions and jets."

Am. Compl. ¶ 29; *see also id.* ¶ 30 ("The Article misleads readers into believing that Plaintiffs sold HIV drugs illegally, unlawfully embezzled monies from charity, and engaged in illicit money laundering through their purchase of mansions and jets and other lavish items with the proceeds of Plaintiffs' illegal and criminal activities.").[15] When read in context, the *full* statement from the Article is as follows:

> "HIV drugs sold on the black market. Clinics profiting from a charity program. Shady pharmacy owners purchasing mansions and jets.
>
> *Such are the accusations Gilead lodged against 58 defendants* in a lawsuit alleging they profited illegally from AIDS prevention drugs that it supplies free to people who can't afford them."

*See* Ex. A (emphasis added). Plaintiffs not only misquote the Article, but they also take it out of context. As is evident from this more fulsome context, the Defendants were summarizing the accusations made by Gilead in the *Gilead* case. When looking at the record in that case, the above statement is a truthful representation of the allegations made by Gilead throughout the suit. *See* Ex. D, Gilead Am. Compl. ¶¶ 7, 356, and generally (noting that "the fraud perpetrated by Defendants significantly undermines the integrity of the MAP and wrongly takes resources from a charitable program operated by Gilead" and that one of the defendant networks repurchased medications back from "patients" so "they c[ould] be resold at a higher price on the black market."); Ex. E, Gilead PowerPoint 51, 62–66 (noting various properties, cryptocurrency, jewelry, cars, private jets, and other expenditures allegedly purchased by the Vesselovs using "tainted accounts"). For these reasons, Statement #1 is true.

       b.   <u>Statement #2 is True.</u>

Plaintiffs next allege that the Article "represents that Plaintiffs defrauded Gilead and used the money to buy a substantial real estate portfolio." Am. Compl. ¶ 32. Plaintiffs appear to be referring specifically to the following statement in the Article:

> "With their ill-gotten gains, *Gilead alleged*, the defendants purchased real estate, cryptocurrency, jewelry, sports cars, and private jets and gambled."

---

[15] For purposes of this motion, Defendants treat the allegations in paragraphs 29–30 of the Amended Complaint as one statement due to their substantial similarity.

*See* Ex. A (emphasis added). Plaintiffs do not allege that this representation is false. Thus, on that basis alone, Plaintiffs' claims should be dismissed. Furthermore, when looking at the record in the *Gilead* case, the above statement is a truthful representation of the allegations made by Gilead throughout the suit. *See* Ex. E, Gilead PowerPoint 51, 62–66. For these reasons, Statement #2 is true.

   c. Statement #3 is True.

Plaintiffs allege that the Article "represents that Plaintiffs 'provided false paperwork' in order to receive reimbursement from Gilead in connection with the MAP program referenced in the Article." Am. Compl. ¶ 32 (emphasis added). Plaintiffs appear to be referring specifically to the following statement in the Article:

> "The defendants *allegedly* provided false paperwork saying that these patients had met the requirements for the program—such as a negative test for HIV—ordered PrEP drugs for them, and then requested and received reimbursement from Gilead."

*See* Ex. A (emphasis added). Plaintiffs do not allege that this representation is false. On that basis alone, Plaintiffs' claims should be dismissed. But even if they had made such an allegation, this statement is exactly what Gilead alleged in the *Gilead* Case. *See* Ex. D, Gilead Am. Compl., ¶¶ 223, 259, 378–79, and generally (discussing the process by which defendants in the *Gilead* case allegedly forged signatures on enrollment paperwork, processed fraudulent MAP enrollments by providing blood testing services, submitted fraudulent redemptions, and wrongfully obtained fees and reimbursement for PrEP medication to recruits that had been fraudulently enrolled). For these reasons, Statement #3 is true.

   d. Statement #4 is True.

Plaintiffs allege that the Article "represents that Plaintiffs sold 'PrEP' drugs on the black market." Am. Compl. ¶ 33. Plaintiffs appear to be referring specifically to the following statement in the Article:

> But sometimes the defendants' practices were more blatantly illegal, *Quan alleged*; they repurchased unused PrEP drugs from patients for $10, then resold them on the black market.

*See* Ex. A (emphasis added). Plaintiffs do not allege that this representation is false. Thus, on that basis alone, Plaintiffs' claims should be dismissed. Furthermore, this statement is a fair summary of what Donna Quan stated in her sworn declaration to the court. *See* Ex. G, Gilead Quan Declaration ¶¶ 43–46 (noting the "substantial evidence" that the *Gilead* defendants repurchased

bottles of already dispensed PrEP for $10 a bottle and therefore amassed further profits by repackaging it for sale on the black market.). For these reasons, Statement #4 is true.

> e.      Statements #5, 6, and 7 are True.

Plaintiffs allege that the Article "represents that Kirill and Mikhail were 'key defendants' and 'two of the alleged Kingpins' in the lawsuit." Am. Compl. ¶ 34. Plaintiffs appear to be referring specifically to the following statements in the Article:

- "'Together, *the Kingpin Defendants* defrauded Gilead's Charitable program of *more than $68 million* in less than 2 years through a fraudulent mass enrollment scheme,' *wrote Gilead attorneys* in a slide presentation submitted to the US District Court for the Southern District of Florida."

- "An attorney for *two of the alleged kingpins* in this scheme, Kirill and Mikhail Vesselov, declined to comment."

- "Gilead settled with some of the *key defendants* in April for an undisclosed amount."

*See* Ex. A (emphases added).

Plaintiffs do not allege that these representations are false. On that basis alone, Plaintiffs' claims should be dismissed. However, even if they had made such an allegation, the first two statements referring to the "kingpins" are truthful and accurate reporting based on the amended complaint and the court's order granting the TRO. *See* Ex. D, Gilead Am. Compl. ¶ 21 (noting that Mikhail and Kirill Vesselov, along with Michael Bogdan and Twiggi Batista, were the kingpins of the two schemes described therein); *see also* Ex. C, Gilead TRO Order 5 n.3; *see also* Ex. E, Gilead PowerPoint 14–15 (heading: "The Vesselovs are the Kingpins"). Thus, Statements 5 and 6 are true.

Further, it is true that Gilead settled with multiple defendants in April of 2022, including Kirill and Mikhail Vesselov. *See* Ex. F, Gilead Dismissal Order (noting that Gilead and multiple defendants, including Mikhail and Kirill Vesselov, had entered into a confidential settlement agreement.). The reference to Plaintiffs as "key defendants," particularly in light of the *Gilead* TRO Order which described them as "kingpins," is a statement subject to the fair/neutral reporting privilege (discussed below) as it does not create a false impression.[16] *See Marder*, 2020 WL

---

[16]This reference to "key defendants" is also a protected statement of opinion. *See Turner*, 879 F.3d at 1262 ("Under Florida law, a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise

3496447, at *4 ("[W]hen read in the context of the larger statements, the challenged statements do not create a false impression.").

For these reasons, Statements #5, 6, and 7 are true.

**2.    The Article is Protected by the Fair/Neutral Reporting Privilege.**

Furthermore, even if the statements at issue were defamatory (which they were not), the Court should dismiss the defamation claims because the statements and the Article are protected by the fair/neutral reporting privilege.

The fair/neutral reporting privilege is extended to disinterested and neutral reporting by members of the media. *Rendón*, 403 F. Supp. 3d at 1276. The fair/neutral reporting privilege gives publishers a "qualified privilege to report accurately on information received from government officials [which] extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Marder*, 2020 WL 3496447, at *4 (finding that several challenged statements, which clearly reiterated *what had been alleged in the complaint and the consent judgment*, did not create a false impression, and fell within the fair report privilege when read in the context of the full publication). "The fair reporting privilege applies even if some of the published information may have been phrased to catch the . . . readership's attention." *Barbuto v. Miami Herald Media Co.*, 2022 WL 123906, at *6 (S.D. Fla. Jan. 13, 2022) (dismissing defamation claim where Barbuto did not articulate how the "fraud mechanic" moniker was inaccurate or unfair.). Whether the fair/neutral reporting privilege applies "is a legal determination that the Court can resolve on a motion to dismiss." *Rendón*, 403 F. Supp. 3d at 1276

As a news media entity and a journalist respectively, Medscape and Mr. Harrison are entitled to assert the fair/neutral reporting privilege. *See U.S. ex rel. Osheroff v. Humana, Inc.*, 2012 WL 4479072, at *6 (S.D. Fla. Sept. 28, 2012) ("The Eleventh Circuit has not specifically defined what constitutes 'news media,' but various district courts have interpreted the term as including disclosures made in newspapers and publicly-accessible websites."); *Mazur v. Baraya*, 275 So.3d 812, 817 (2d Fla. Dist. Ct. App. 2019) ("In defining the term 'media defendant,' courts have considered whether the defendant engages in the traditional function of the news media,

_____

known or available to the reader or listener as a member of the public."); *see also Marder*, 2020 WL 3496447, at *5–6 (Dismissing claim where a TV station stated "A disgusting crook, that's what they are calling this guy, and it's not hard to understand why" because the statement was one of pure opinion and made in the context of a larger publication which set out the facts on which it was based.).

which is 'to initiate uninhibited, robust, and wide-open debate on public issues.'") (quoting *Tobinick v. Novella*, 2015 WL 1191267, at *8 (S.D. Fla. Mar. 16, 2015)); *Gubarev v. Buzzfeed, Inc.*, 2017 WL 6547898, at *3 (S.D. Fla. Dec. 21, 2017) (noting that Florida's "Shield Law" defines "professional journalist" as a person "regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood, who obtained the information sought while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine.").[17]

Plaintiffs allege that the Article generally "mischaracterizes the Gilead Action and the allegations against the Plaintiffs" because the allegations in the Article "appear to apply to every defendant in the Gilead Action." *See* Am. Compl. ¶ 31. Plaintiffs further allege that the Article left out numerous facts, such as that the allegations were contested, never proven, and never admitted by Plaintiffs; that Plaintiffs filed a counterclaim against Gilead; that Plaintiffs' filings in the *Gilead* Case were disregarded, and Plaintiffs further contend that Mr. Harrison failed to obtain a statement from Plaintiffs. *Id.* ¶¶ 36–39, 44, 51.

But neither the individual statements nor the Article, read as a whole, create a false impression. In fact, the Article explicitly and repeatedly outlines that the statements at issue are allegations and accusations *by Gilead and/or witnesses in the case*. *See* Ex. A. ("Such are the accusations Gilead lodged . . . ." ". . . wrote Gilead attorneys in a slide presentation . . . ." "In the scheme alleged by Gilead . . . ." "According to Gilead . . . ." ". . . Gilead alleged . . . ."). The Article also notes that Gilead's allegations might not be true. *Id.* ("Whether Gilead's specific allegations are true, . . . ."). The Article includes comments denying Gilead's accusations and pushing back against Gilead's claims. *Id.* ("But the attorney for one group insists that her clients have been falsely accused . . . ." "[T]here was zero evidence of any wrongdoing . . . ." "Gilead is trying to avoid giving its drugs away . . . ." "Gilead . . . tries to shut them out of the program with aggressive litigation." "Whistleblowers . . . recanted their accusations or disappeared."). The Article also

---

[17] The Amended Complaint itself recognizes that the Defendants are news media and journalists. *See* Am. Compl. ¶ 13, noting that Laird Harrison's work has appeared in magazines, newspapers, public radio, and on websites, and that readers should follow Medscape for "more news." *See also id.* ¶¶ 57–60, noting that pre-suit notice was served on Medscape pursuant to Florida Statutes section 770.01, which applies specifically to media defendants.

notes that some of the key defendants settled and does not reference any specific admission, proof, or finding of liability against any of the defendants in the *Gilead* Case.

When read in context, the Defendants' account of the *Gilead* Case is at a minimum substantially accurate, if not entirely accurate, and thus falls within the fair/neutral reporting privilege. "The law does not require *perfect* accuracy, only that the publication be *substantially* true." *Jeter*, 2014 WL 4996247, at *2 (emphases added). "[T]he privilege applies even when reporting omits pertinent information." *Barbuto*, 2022 WL 123906, at *6. The privilege does not require the press to "investigate the accuracy of official statements." *Jeter*, 2014 WL 4996247, at *2. Nor is the press required to "describe legal proceedings in technically precise language." *Klayman v. Politico LLC*, 2022 WL 1134304, at *8 (15th Fla. Cir. Ct. Mar. 22, 2022) (quoting *Rasmussen v. Collier Cnty. Publ'g Co.*, 946 So.2d 567, 570 (2d Fla. Dist. Ct. App. 2006). The press is not required to "include additional information that would portray the Plaintiff in a favorable light." *Id.* at *9 (quoting *Folta v. N.Y. Times Co.*, 2019 WL 1486776, at *8 (N.D. Fla. Feb. 27, 2019); *see also Turner*, 879 F.3d at 1270 (quoting *Perk v. Reader's Digest Ass'n*, 931 F.2d 408, 412 (6th Cir. 1991) ("Publishers have no legal obligation to present a balanced view . . . ."). "The law of defamation is concerned with whether a publisher reports a story <u>truthfully</u>, not generously." *Turner*, 879 F.3d at 1270 (cleaned up).

Because the Article is subject to the fair/neutral reporting privilege, Plaintiffs' Amended Complaint must be dismissed in its entirety.

### C.   Defendants are Entitled to Attorney's Fees and Costs Pursuant to Florida's Anti-SLAPP Statute.

Defendants are entitled to recover their attorneys' fees and costs under Florida's anti-SLAPP law. The statute prohibits any person from filing a lawsuit that is (1) "without merit", and (2) filed "because [the defendant] has exercised the constitutional right of free speech in connection with a public issue." Fla. Stat § 768.295(3). "'Free speech in connection with public issues' means any written or oral statement that is protected under applicable law and . . . is made in or in connection with a . . . news report, or other similar work." *Id.* § 768.295(2)(a). The statute further provides that "[t]he court *shall award* the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section." *Id.* § 768.295(4) (emphasis added).

Because Plaintiffs' suit fails to state a claim for defamation, it is without merit under Florida Statutes section 768.295(3). *Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310, 1322 (S.D.

Fla. 2020) ("Because Plaintiff's suit fails to state a claim for defamation, it was without merit under [the statute]."); *Corsi*, 519 F. Supp. 3d at 1128 (finding that the defendants were entitled to an award of attorney's fees and costs because the lawsuit was meritless). Further, because the Article is a news report on a public lawsuit that was ongoing at the time of publication, it clearly constituted "free speech in connection with a public issue" and is protected under applicable law. *Bongino*, 477 F. Supp. 3d at 1322 (holding that because plaintiff's suit arose out of defendant's news report, the second element—free speech in connection with a public issue—was satisfied); *see also Vibe Ener v. Duckenfield*, 2020 WL 6373419, at *5 (S.D. Fla. Sept. 29, 2020) (holding that the plaintiff's claims arose out of "free speech in connection with a public issue" because the April 2019 Article was a news report concerning a publicly filed lawsuit); *Parekh*, 820 Fed. App'x at 836 (affirming award of fees because the suit arose out of the defendants' protected First Amendment activity—publishing a news report on a matter of public concern). Thus, in these circumstances, an award of reasonable attorneys' fees and costs is mandatory. Fla. Stat. § 768.295(4).[18]

Defendants are thus entitled to an award of fees and costs.

## V.    **CONCLUSION**

For these reasons, Defendants respectfully request that the Court dismiss Plaintiff's Amended Complaint, award attorney fees and costs to the Defendants, and award any additional relief the Court deems appropriate and just.

---

[18] Should the Court find that this action violates the anti-SLAPP law, Defendants will file a formal fees motion in accordance with Local Rule 7.3.

Dated: July 27, 2023                      Respectfully Submitted,

/s/ Emanuel L. McMiller
Traci T. McKee (FL #53088)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 Jackson Street, Suite 201
Fort Myers, Florida 33901
Tel:  (239) 286-6900
Fax: (239) 244-9053
traci.mckee@faegredrinker.com

Emanuel L. McMiller (FL #1025242)
FAEGRE DRINKER BIDDLE & REATH LLP
300 N. Meridian Street, Suite 2500
Indianapolis, Indiana 46204
Tel:  (317) 237-0300
Fax: (317) 237-1000
manny.mcmiller@faegredrinker.com

Zoë K. Wilhelm
(*admitted pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel:   (310) 203-4000
Fax:  (310) 229-1285
zoe.wilhelm@faegredrinker.com

*Attorneys for Defendants Laird Harrison and Medscape LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2023, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

/s/ Emanuel L. McMiller
Emanuel L. McMiller